## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA KILBY-ROBB, <br><br>         *Plaintiff*, <br><br>     v. <br><br> ELISABETH DEVOS, Secretary, U.S. Department of Education, <br><br>         *Defendant*. |      Civil Action No. 13-718 (RDM) |

## MEMORANDUM OPINION

Plaintiff Patricia Kilby-Robb was passed over for a promotion at the Department of Education in 2011.   She then sued the Department, alleging unlawful discrimination on the bases of age, race, and color, as well as unlawful retaliation, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA").  The parties have since completed discovery.  Because Kilby-Robb has adduced no competent evidence that her nonselection occurred for discriminatory or retaliatory reasons, the Court will **GRANT** the Department's motion for summary judgment.

## I.  BACKGROUND

### A.    Kilby-Robb's Employment at the Department Prior to 2011

Kilby-Robb, who is African-American, has worked as an Education Program Specialist at the Department of Education since June 2000.  Dkt. 24 at 3 (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 2).  She was fifty-two years old when she began.  *See* Dkt. 27 at 3. Between 2000 and 2002, she worked in the Department's Office of Elementary and Secondary Education, after which she was transferred to the Office of Innovation and Improvement ("OII").

Dkt. 24 at 3 (Def.'s SUMF ¶ 2).  The OII is charged with administering certain discretionary

educational grant programs, including the Parental Information Resource Centers ("PIRC")

program and the Charter Schools Program ("CSP").  *Id.* (Def.'s SUMF ¶¶ 1, 2).  Kilby-Robb

worked in the PIRC program between 2002 and 2009, and the CSP from 2009 through the

relevant events in 2011.  *Id.* (Def.'s SUMF ¶ 2).  She retained the same job title (Education

Program Specialist) and the same pay grade (GS-13, step 10) throughout her time at the

Department.  Dkt. 27-2 at 3 (Kilby-Robb Decl. ¶ 2).

　　Between 2002 and August 2010, Kilby-Robb filed five equal employment opportunity

("EEO") complaints against the Department, generating substantial litigation.  Dkt. 27-2 at 25;

*see Kilby-Robb v. DeVos*, No. 14-cv-2200 (TSC) (D.D.C. Mar. 30, 2017) (slip op.) (granting

summary judgment for the Department on all claims); *Kilby-Robb v. Duncan*, --- F. Supp. 3d ---,

2016 WL 5415616 (D.D.C. Sept. 28, 2016) (granting summary judgment for the Department on

all claims); *Kilby-Robb v. Duncan*, 77 F. Supp. 3d 164 (D.D.C. 2015) (granting summary

judgment for the Department on race and age discrimination nonselection claims and denying

summary judgment on retaliation claims); *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148 (D.D.C.

2007) (granting summary judgment for the Department on all claims), *aff'd*, 309 Fed. App'x 422

(D.C. Cir. 2009).  The factual bases for those complaints, however, are not present in the record.

　　What is in the record is Kilby-Robb's sworn testimony (in the form of verified

interrogatory responses and a declaration), in which she says that she was "plainly targeted" by

the Associate Assistant Deputy Secretary for OII, Margo Anderson.  Dkt. 27-2 at 16 (Kilby-

Robb Resp. to Interr. No. 5); *see also* Dkt. 27-2 at 2–6 (Kilby-Robb Decl.).  Anderson, who is a

Caucasian woman above the age of forty, served as Kilby-Robb's second-line supervisor (*i.e.*,

the supervisor of Kilby-Robb's supervisor), Dkt. 24 at 4 (Def.'s SUMF ¶ 4), and "was the

authorizing authority for which positions are advertised to hire or promote an employee" in OII. Dkt. 27-2 at 3 (Kilby-Robb Decl. ¶ 6).

According to Kilby-Robb, Anderson "consistently" passed over her for promotions "in favor of younger, Caucasian employees" whom Kilby-Robb views as less qualified than herself. Dkt. 27-2 at 14 (Kilby-Robb Resp. to Interr. No. 5). Kilby-Robb lists four such employees as examples, *see id.* at 14–15, but does not elaborate on their relative qualifications. Kilby-Robb does say, however, that four of her first-line supervisors told her at various points between 2003 and 2011 that Anderson "said she would never promote [Kilby-Robb]" and that, during a meeting to discuss her 2007–2008 performance evaluation, Kilby-Robb's first-line manager said that Anderson "hates" her. Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 8).

Kilby-Robb argues in her brief that Anderson and her "subordinates" made "several statements demonstrating their discriminatory biases." Dkt. 27 at 5. In Kilby-Robb's declaration and interrogatory responses, she recounts the following incidents, which she asserts provide relevant background for her current claims:

(1) In 2002, Anderson told the union steward, Shelton Allen, that "certain African-Americans should not have been promoted, particularly a certain African-American male who[m] [Anderson] did not like." Dkt. 27-2 at 15–16 (Kilby-Robb Resp. to Interr. No. 5). In response, Allen "became agitated and called . . . Anderson racist." *Id.* Kilby-Robb does not explain how she has personal knowledge of this incident. *See id.*

(2) On another unspecified occasion, several African-American men whom Anderson had passed over for promotion confronted Anderson, and Anderson "stated that there were African-American males that did not deserve to be promoted." Dkt. 27-2 at 15 (Kilby-

Robb Resp. to Interr. No. 5).  Kilby-Robb does not explain how she has personal

knowledge of this incident, either.  *See id.*

(3)  During a meeting in 2004, Kilby-Robb heard one of Anderson's subordinates state that

the subordinate "would hire African-American males if [the subordinate] could find any

who were competent."  Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 7).  Anderson said nothing to

refute the statement.  *Id.*

(4)  In December 2004, Nina Rees, an Associate Deputy Secretary, told Kilby-Robb that

Kilby-Robb "should have been 'fired' for filing an EEO complaint."[1]  Dkt. 27-2 at 4

(Kilby-Robb Decl. ¶ 9).

(5)  Also in December 2004, Kilby-Robb's then-first-line supervisor, John Fiegel, told her

that he "want[ed] [her] out of [his] program."  Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 9).

Kilby-Robb does not state why she believes this statement had a discriminatory or

retaliatory motive.  *See id.*

(6)  On an unspecified date, Fiegel told Kilby-Robb that "he had previously planned to submit

a request for payment on [her] behalf for [her] service as an 'acting team leader,'" but

that "he was no longer going to submit this request because [she] had filed an EEO case."

Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 9).

(7)  On another unspecified date, an Assistant Associate Deputy Secretary for OII, Michael

Petrilli, called Kilby-Robb to his office for a meeting and "stated, in reference to [her]

EEO complaint, 'You have been a manager, and you know what is happening to you,

---

[1]  In one of Kilby-Robb's prior lawsuits, Rees's statement was held competent circumstantial
evidence from which a reasonable jury could find that Kilby-Robb's 2005 nonselection to
another position in the PIRC office was motivated by retaliatory animus.  *See Kilby-Robb*, 77
Fed. Supp. 3d at 176.  The trial resulted in a verdict for the defense.  *See Kilby-Robb v. Duncan*,
No. 12-cv-1718 (CRC), ECF No. 82 (D.D.C. Sept. 25, 2015).

don't you?'" Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 9).  Kilby-Robb adds that Petrilli "told

[her] that [she] had to do what Macie Brown, Stacy Kreppel, and Courtney Phillips told

[her] to do," *id.*, but Kilby-Robb does not specify who those individuals are or what they

"told her to do."

In 2009, Kilby-Robb was transferred to the CSP office, where her first-line supervisor

was initially Dean Kern.  Dkt. 27-2 at 14 (Kilby-Robb Resp. to Interr. No. 5).  Kern had

previously been one of Kilby-Robb's peers, but had been promoted over her to the position of

Director of the CSP.  *Id.*  Kilby-Robb states that she "was the only person assigned to be

supervised by" Kern, that Kern "immediately removed all of [her] higher level duties," and that

Kern "worked closely with . . . Anderson to attempt to get rid of [her]."  *Id.*  Kilby-Robb declares

"on information and belief" that Kern and his successor, Scott Pearson, "refused to assign

[Kilby-Robb] CSP grants to prevent [her] from receiving a promotion in the CSP."  Dkt. 27-2 at

4–5 (Kilby-Robb Decl. ¶ 10).

**B.**     **The 2011 SMPA Vacancy Announcement**

In June 2011, Stefan Huh, an Asian/Caucasian man over forty, became a Supervisory

Management and Program Analyst ("SMPA") in the CSP office.  Dkt. 24 at 4 (Def.'s SUMF

¶ 3).  Shortly thereafter, Huh decided to create a new SMPA position, whose occupant would

share his responsibilities.  Dkt. 24 at 4 (Def.'s SUMF ¶ 8); Dkt. 24-1 at 47–49 (Hsu Aff. ¶¶ 18,

28, 30).  Because Huh was relatively new to the agency, the OII's Executive Officer, Pat Knight,

"discuss[ed] with him the selection process and the possible forms he could use."  Dkt. 24-2 at

11 (Knight Aff. ¶ 10).  Knight did not, however, "discuss the selection [itself] or [any]

applicants."  *Id*.  Huh attests that neither Anderson nor Knight "influenced . . . or contacted" him

regarding the position; rather, they merely "reinforced the need and expectation that there would

be an appropriate and fair interview process." Dkt. 24-1 at 47 (Huh Aff. ¶ 18); *accord* Dkt. 24-2 at 3 (Anderson Aff. ¶¶ 9–14) ("I was not involved in any way with the selection for this position."); *id.* at 11 (Knight Aff. ¶¶ 9–13) ("I did not try to influence the selection for this position in any way."); *see also id.* at 20 (Araujo Aff. ¶¶ 14–15); *id.* at 31 (Ceja Aff. ¶¶ 14–15). According to Huh, "[p]osting and designing the position was all at [his] discretion and under [his] control." Dkt. 24-1 at 47 (Huh Aff. ¶ 18).

The new SMPA position was listed in a public vacancy announcement from September 9, 2011, to September 16, 2011. Dkt. 24 at 5 (Def.'s SUMF ¶ 11); *see* Dkt. 24-3 at 2–4.   It carried a GS-14 pay grade. Dkt. 24-3 at 2.   According to the announcement, the position was established to help "oversee key grant programs and contracts," "supervise employees," and analyze both the effectiveness and efficiency of general CSP programs and management.   *Id.* The announcement emphasized that the hiree would oversee the grant programs for "state education agencies" ("SEAs"),[2] non-SEAs, and Charter School Management Organizations ("CMOs").   *Id.*   The hiree would also "oversee and implement" the "National Charter Schools Resource contract."   *Id.*   In service of this last requirement, the hiree would have to be certified as a "contracting officer representative," or "COR."   *Id.*

The official job description listed specific "unique position requirements":

1. Oversee the following Charter School grant programs . . . :   *SEA, Non-SEA, CMO*.  This involves the following . . . :

---

[2]  A "[s]tate educational agency" is a term of art in the field meaning "the agency primarily responsible for the State supervision of public elementary schools and secondary schools."  20 U.S.C.A. § 7801(49).

a. *Direct and oversee all activities for the program grant competitions and awarding of grants* including: drafting federal register notices; creating application packages; drafting technical review plans; overseeing competition management and panel facilitation; completing internal review; analyzing applicant budgets and determining any budget modifications; drafting a slate memo for Departmental clearance; processing awards; and communicating with approved and disapproved applicants.

b. *Direct and oversee the monitoring of grants*, including interacting with current prospective grantees and responding to their concerns and questions; conducting post-award calls; conducting quarterly monitoring updates; updating G5 accounts and spreadsheets; consulting with OGC as questions arise; and tracking grantee responsiveness to our monitoring visits and reviews.

c. *Direct and oversee the process to award the noncompetitive grant continuation awards* including reviewing budgets and grant drawdowns and preparing continuation recommendations;

2. *Supervise and manage at least three employees*, taking responsibility for assisting them achieve their professional objectives; providing oversight, coaching, feedback, and assistance on a regular basis; setting REACH critical elements and performance standards; providing interim and year-end evaluations, and addressing any conduct or performance issues.

3. *[O]versee implementation of the National Charter Schools Resource Center contract* including developing the contract's annual modifications, providing weekly guidance to the contractor on the execution of the contract; overseeing implementation of the major elements of the contract; reviewing budgets and expenditures to ensure efficient use of federal funds.  A certified COR is required.

4. *Represent the program to stakeholders and outside constituencies*, including leading project director's meetings, providing first- or second-level responses to grantees, communicating with outside parties, and representing the Department before stakeholder groups.

Dkt. 24-4 at 8–9 (emphases added).  Kilby-Robb states in her declaration that the vacancy announcement "did not use the standard elements for 'Grants Management' and 'COR' duties and responsibilities, which are typically used for [SMPA] positions."  Dkt. 27-2 at 5 (Kilby-Robb Decl. ¶ 11).

7

C.       **Kilby-Robb's Nonselection**

The Human Resources department identified two employees whom it "deemed to be qualified": (1) Kilby-Robb, who was then sixty-three years old, and (2) Erin Pfeltz, a thirty-two-year-old Caucasian woman with no prior EEO activity.  Dkt. 24-1 at 45 (Huh Aff. ¶ 10); *accord* Dkt. 24 at 6 (Def.'s SUMF ¶¶ 17, 18).  Both candidates were selected for interviews.

1.       *Kilby-Robb's Qualifications*

Kilby-Robb holds two degrees from Howard University: a Bachelor's in psychology, education, and mathematics she earned in 1970, and a Master's in developmental psychology and education she earned in 1974.  Dkt. 24-1 at 34 (Kilby-Robb Resume).   She has also pursued other educational opportunities, including participating in two Ph.D. programs.  *Id.*  Before starting her career at the Department, she spent "[m]ore than twenty-five years" as an educator in the District of Columbia public school system.  *Id.* at 31, 34.  Between 1968 and 1999, she worked in local public schools in various capacities including teacher, counselor, and ultimately, principal.  *Id.* at 36–37.  In the mid-1990s, she led a "two-year quest" for her school's elementary school accreditation, which the school received in 1997.  *Id.* at 37.  She was at one point selected the "Principal of the Year."  *Id.* at 36.  In addition, between October 1999 and June 2000, she worked as an "education consultant," where she implemented educational reforms to "turn around low-performing schools" across the country.   *Id.* at 36.

In 2000, Kilby-Robb began working at the Department in the Office of Elementary and Secondary Education, where she worked until 2002.  Some of her responsibilities involved "grants management."  *Id.* at 35.  Between 2002 and 2009, she worked in the OII's PIRC office.  *Id.*  In that capacity, she again served as a grant review competition manger in 2002, 2003, and 2006, and served as the COR for the National PIRC Coordination Center, which, according to

her resume, required her to "[r]eview[] and approve[] performance and evaluation electronic system[s] to collect, compile, summarize, and analyze qualitative and quantitative performance data." *Id.* Finally, in 2009, she began work at the CSP office, where she "was not given any grants in the Charter Schools program." Dkt. 24-3 at 47 (Kilby Robb. Resp. to Interr. 11 in another of her lawsuits); *see also* Dkt. 29-1 at 2–3 (Kilby-Robb Dep. 27–28). Instead, she worked primarily on "funds in education" grants, which she characterizes as "low level" work "generally reserved for career interns and employees below a GS-12 level." Dkt. 24-3 at 47–48.

2.     *Pfeltz's Qualifications*

Pfeltz received a Bachelor's degree in Economics from St. Mary's College of Maryland in 2001, and a Master's degree in International Affairs from George Washington University in 2003. Dkt. 24-3 at 36 (Pfeltz Resume). As Kilby-Robb emphasizes, Margo Anderson (*i.e.*, Kilby-Robb's second-line supervisor), was the sister of Pfeltz's aunt, and encouraged Pfeltz to apply to the Department after graduation. Dkt. 27 at 9 (citing Dkt. 28-1 at 101 (Pfeltz Dep. 100)).

Pfeltz did apply, and in 2004 she began her career in the CSP office, Dkt. 24-3 at 35, where she progressed quickly through the ranks. Her initial role was as a GS-7 Management and Program Analyst "for the non-SEA grantee portfolio." Dkt. 28-1 at 11 (Pfeltz Dep. 10). Thirteen months later, she was promoted to GS-9, and took on responsibility for "a larger portfolio of [non-SEA] grantees." *Id.* at 14–15 (Pfeltz Dep. 13–14). Many of her responsibilities were among those specifically listed in the new position's description, including: "drafting the [federal register] notices for the grant competition," *id.* at 15–16 (Pfeltz Dep. 14–15), "putting together the technical review plan[s]," *id.* at 16, 20 (Pfeltz Dep. 15, 19); "participating in competition as a panel monitor," *id.* at 11 (Pfeltz Dep. 10), "completing budget reviews" and

making funding recommendations, *id.* at 67 (Pfeltz Dep. 66); "developing slate memos," *id.*; "communication with the grantees," *id.* at 11 (Pfetlz Dep. 10); "review of performance reports and data submitted by grantees [to] determine[] whether or not grantees in the grant program w[ere] performing well," *id.* at 54–55 (Pfeltz Dep. 53–54); providing technical assistance to grantees, *id.* at 24 (Pfeltz Dep. 23); "conducting monitoring and site visits for grantees," *id.* at 22 (Pfeltz Dep. 21); and "developing the peer reviewer training and setting up the peer reviewer system in [the] G5 [software]," *id.* at 20 (Pfeltz Dep. 19). After another twelve months, she was promoted again to a GS-11 Management and Program Analyst. *Id.* at 20–21 (Pfeltz Dep. 19–20). Her responsibilities at this level remained largely the same but at "a more autonomous level." *Id.* at 22 (Pfeltz Dep. 21).

In September 2009, Pfeltz received a promotion to a GS-13 Management and Program Analyst, the highest possible grade for that position. *Id.* at 28 (Pfeltz Dep. 27). Her duties continued to involve "grant competitions and management and monitoring of grantees and grant programs," *id.* at 29 (Pfeltz Dep. 28), but her promotion also carried two new responsibilities. First, she "began to take over responsibility for a new grant program": the competition for Charter School Management Organizations. *Id.* at 32 (Pfeltz Dep. 31). Because the CMO program "was a new competition that hadn't been run before," Pfeltz had to "[work] from scratch" to develop criteria by which CMOs would be solicited and evaluated. *Id.* at 32–33 (Pfeltz Dep. 31–32). Second, starting in fall 2009, Pfeltz served as "the primary COR" for the National Charter Schools Resource Center contract. *Id.* at 60–61 (Pfeltz Dep. 59–60); *accord id.* at 40 (Pfeltz Dep. 39). Her role as COR required her to "represent [the Department] to stakeholders and constituencies," including at the National Charter School Conference and "the occasional" State Charter School Conference. *Id.* at 62–63 (Pfeltz Dep. 61–62). On August 20,

10

2010, Pfeltz's supervisor nominated her for a "Special Act Award," praising her for "stepp[ing] up to essentially oversee the CMO competition on her own," while simultaneously "overs[eeing] [the] relationship with Learning Point and the National Charter Resource Center."  Dkt. 24-4 at 11.

Pfeltz agrees, however, that by the time the contested SMPA position became available in 2011, she had only "a little" experience with the SEA program (as opposed to the non-SEA program, with which she was well-versed), Dkt. 28-1 at 39 (Pfeltz Dep. 38), and that she "had no responsibility for supervising employees," *id.* at 54 (Pfeltz Dep. 53).

### 3. *The Interview and Selection Process*

Huh was the "selecting official" for the new GS-14 SMPA position, Dkt. 24-1 at 45 (Huh Aff. ¶ 10), but the interview and evaluation was conducted by a panel of three people: (1) Liza Araujo, an African-American woman over forty; (2) Beatriz Ceja, a Hispanic woman over forty; and (3) Huh himself,  Dkt. 24 at 7–8 (Def.'s SUMF ¶¶ 21, 30).  The panel interviewed both Kilby-Robb and Pfeltz, using the same set of interview questions.  *Id.*  (Def.'s SUMF ¶ 22).  The candidates were given equal time to respond to each question.  *Id.*  Araujo's notes documented the candidates' answers.  *See* Dkt. 24-4 at 13–17, 19–23.  Each panel member scored each applicant individually.  Dkt. 24 at 7 (Def.'s SUMF ¶ 23).  The scores from the panel members were then combined "for a group consensus" at a meeting.  *Id.*  Kilby-Robb received a total score of 6, whereas Pfeltz received a score of 7.5.  Dkt. 24-4 at 2, 4.

The panel agreed that, although Kilby-Robb "ha[d] more supervisory experience," she was "not able to demonstrate a full understanding of the technical area."  Dkt. 24-1 at 46 (Huh Aff. ¶ 12).  "In the very general policy area of charter schools," Huh attested, "Pfeltz was able to better demonstrate her understanding of factors that impact charter schools."  *Id.* (Huh Aff. ¶ 14).

He added that Pfeltz "demonstrated greater understanding than" did Kilby-Robb regarding "federal grant programs, designing new programs, conducting grant competitions, and monitoring grantees at a high level." *Id.* Araujo concurred that Pfeltz "demonstrated a clear understanding of the full scope of the job"; that Pfeltz's work experiences were "consistent with the requirements of th[e] position"; and that her "responses were more comprehensive and thought out," whereas Kilby-Robb's answers "were more general and focused more on her work with other programs." Dkt. 24-2 at 20 (Araujo Aff. ¶ 13). Ceja also agreed that Pfeltz "was more comprehensive in her responses" and that, "[b]ecause of her background, [Pfeltz] displayed a detailed knowledge of the programs for th[e] position." *Id.* at 31 (Ceja Aff. ¶ 13). "It was the joint consensus of the panel that [Pfeltz] was best qualified for the position," so Huh selected Pfeltz. Dkt. 24-1 at 45, 47 (Huh Aff. ¶¶ 10, 15).

**D.     The Current Litigation**

On January 5, 2012, Kilby-Robb filed a formal discrimination complaint with the Department's EEO office. Dkt. 1 at 6 (Compl. ¶ 30); *see id.* at 10. The Department undertook an investigation, *see* Dkt. 1 at 15–29 (Investigative Summary), and collected affidavit testimony from Kilby-Robb, Dkt. 24-1 at 4–25; Huh, *id.* at 44–53; Anderson, Dkt. 24-2 at 2–5; Knight, *id.* at 10–16; Araujo, *id.* at 18–24; Ceja, *id.* at 29–33; and an additional witness whose testimony is not in the record, *see* Dkt. 1 at 12–13. On February 7, 2013, the Department issued a final decision finding that no unlawful discrimination occurred. Dkt. 1 at 30–40. Kilby-Robb then filed a *pro se* complaint in this Court. *See* Dkt. 1 at 6 (Compl. ¶¶ 32–34). She later retained counsel. Dkt. 7. The parties engaged in discovery for almost nine months, *see* Dkt. 6; Minute Entry of November 13, 2014, and the Department then moved for summary judgment, Dkt. 24.

## II.  LEGAL STANDARD

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When, as here, the plaintiff bears the ultimate burden of proof, but the defendant has moved for summary judgment, the defendant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  In determining whether the nonmoving party has raised a genuine issue of material dispute, the Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

"Although summary judgment is not the occasion for the court to weigh credibility or evidence, . . . summary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (internal citations and quotation marks omitted).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a

reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

## III.  ANALYSIS

Title VII prohibits the federal government from discriminating against its employees on the basis of race or color, 42 U.S.C. § 2000e-16, and from retaliating against employees who participate in Title VII investigations or proceedings, *see id.* § 2000e-3(a); *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (citing *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977)).  The ADEA likewise prohibits the federal government from discriminating against its employees aged forty or older on the basis of age, 29 U.S.C. § 633a(a), and from retaliating against them for filing age discrimination complaints, *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008).

When the employee relies on circumstantial evidence to prove her employer's intent, her claims are evaluated under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *DeJesus v. WP Co. LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (Title VII and ADEA discrimination); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII and ADEA retaliation).  "Under this formula, an employee must first make out a prima facie case of retaliation or discrimination.  The employer must then come forward with a legitimate, nondiscriminatory or non-retaliatory reason for the challenged action." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citations omitted).  Once the employer proffers a legitimate non-discriminatory and non-retaliatory reason, however, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, the Court should decide only

14

the ultimate question:  "Has the employee produced sufficient evidence for a reasonable jury to

find that the employer's asserted nondiscriminatory [and non-retaliatory] reason was not the

actual reason and that the employer intentionally discriminated against the employee on the basis

of race, color, [or age], [or retaliated against the employee for engaging in protected activity]?"

*Id.*; *accord Morris v. McCarthy*, 825 F.3d at 668; *Allen v. Johnson*, 795 F.3d 34, 39 & n.4 (D.C.

Cir. 2015).  On this question, "[t]he ultimate burden of persua[sion] . . . remains at all times with

the plaintiff."  *Jackson v. Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007) (first alteration in

original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Kilby-Robb contends that her 2011 nonselection for the SMPA position constituted

unlawful discrimination on the basis of race, color, and age, as well as retaliation under Title VII

and the ADEA.[3]  Dkt. 1 at 6 (Compl. ¶ 33).  And the Department has proffered a legitimate

reason for the nonselection—namely, that "Pfeltz was the stronger candidate."  Dkt. 24 at 15;

*see also* Dkt. 24-1 at 45–46 (Huh Aff. ¶¶ 10–14).  The only question, therefore, is whether a

---

[3]  In addition to the nonselection, Kilby-Robb's *pro se* complaint might be read to allege that the
Department discriminated on the basis of age when it planned to allocate employees between the
group supervised by Huh and the group supervised by the newly-hired SMPA.  *See* Dkt. 1 at 5
(Compl. ¶¶ 25–27).  Employees age forty or younger were allegedly to be placed in the first
group, while older employees were allegedly to be placed in the second.  *Id.* (Compl. ¶ 25).

The Department's motion addresses this claim by arguing, among other things, (1) that the
allocations were based not on age but on the characteristics of the employees' programs; (2) that
one over-forty employee was placed in the "young" group and one under-forty employee was
placed in the "old" group; and (3) that Kilby-Robb's placement in one supervisory group rather
than another is not an "adverse action" cognizable under the ADEA.  Dkt. 24 at 26–27.  Kilby-
Robb's opposition does not address these issues.  *See* Dkt. 27.

The Department's factual assertions are taken as conceded, *see* Local Civil Rule 7(h), and the
Department's legal assertion is correct, *see, e.g.*, *Broderick v. Donaldson*, 437 F.3d 1226, 1233–
34 (D.C. Cir. 2006) (holding that for an employee to have her work reviewed by one supervisor
rather than another does not by itself constitute an adverse employment action).  On these
grounds, the Court will grant summary judgment for the Department on this issue.

reasonable jury could find this stated reason "[to be] a mask" for discrimination or retaliation. *Allen*, 795 F.3d at 39.

## A.      Race, Color, and Age Discrimination

Although Kilby-Robb does not neatly organize her arguments, *see* Dkt. 27 at 29–40, the Court will consider the following categories in turn:  (1) arguments from the purported disparity in qualification between Kilby-Robb and Pfeltz; (2) arguments from Pfeltz's alleged "preselection" (*i.e.*, that the new position was designed specifically for Pfeltz); (3) arguments from alleged procedural deficiencies in the selection process; and (4) arguments from what the Court can only describe as an alleged conspiracy.[4]

None of these arguments is persuasive.

### 1.      *Qualifications Gap*

Kilby-Robb argues that her qualifications were so superior to Pfeltz's that a reasonable jury could infer that the Department's proffered reason is pretextual.  Dkt. 27 at 30–31, 36–40; *accord* Dkt. 1 at 3–4 (Compl. ¶¶ 11–20).  Although this Court does not sit as a "super-personnel department," *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016), a qualifications gap may provide evidence of pretext if "a reasonable employer would have found the plaintiff to be *significantly* better qualified for the job" than the applicant who was selected, *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (emphasis added) (quoting *Aka v.*

---

[4]  In addition, Kilby-Robb's complaint correctly observes that pretext may be inferred from the employer's "general treatment of minority employees." *Allen*, 795 F.3d at 40; *see* Dkt. 1 at 5 (Compl. ¶ 28).  The Department responds with a list of minority and above-forty OII employees promoted through vacancy announcements between 2008 and 2014.  Dkt. 24 at 8 (Def.'s SUMF ¶¶ 30, 31); *see* Dkt. 24-2 at 38–39.  Although Kilby-Robb's brief quibbles with the list as not including two individuals Kilby-Robb believes to have been promoted, *see* Dkt. 27 at 34–35, she does not meaningfully argue that the list's contents give rise to an inference of pretext or that the list otherwise demonstrates a pattern of discriminatory treatment of employees (even with the modifications that she proffers).

*Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998)).  It is not enough, however, if a reasonable juror could find the employer's decision between the candidates to have been "close." *Id.*  To permit an inference of pretext, the "disparity in qualifications" must be "great enough to be inherently indicative of discrimination."  *Id.*  That is, the plaintiff must be "'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified'" than the successful candidate."  *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)); *see also, e.g.*, *Kilby-Robb v. Duncan*, 77 F. Supp. 3d at 171–74 (applying this standard to find that Kilby-Robb was not "significantly better qualified" than the candidate selected for a different position in 2005).

Here, the newly created SMPA position carried four "unique position requirements." First, the new SMPA's primary responsibility was to "[o]versee the following Charter School grant programs . . . :  SEA, Non-SEA, [and] CMO."  Dkt. 24-4 at 8.  This job would entail "[d]irect[ing] and oversee[ing] all activities for the program grant competition" and "the monitoring of grants."  *Id.*  It would also require the SMPA to develop and evaluate new grant programs and management policies.  Dkt. 24-3 at 2.  Second, the SMPA would have to "[s]upervise and manage at least three employees."  Dkt. 24-4 at 8.  Third, the SMPA would have to "oversee implementation of the National Charter Schools Resource Center contract."  *Id.* And fourth, the SMPA would have to "[r]epresent the program to stakeholders and outside constituencies."  *Id.*  The SMPA was also required to be a "certified COR."  Dkt. 24-3 at 2.

Having spent seven years at the CSP office as a Management and Program Analyst, Pfeltz was indisputably well-qualified for the position of Supervisory Management and Program Analyst.  As Kilby-Robb acknowledges, Pfeltz quickly excelled during her tenure at the Department:  "[S]he received a merit promotion or step increase every single year of her

employment." Dkt. 27 at 33 (Kilby-Robb's Opp. Br.).  In addition, the undisputed evidence

shows that Pfeltz brought a wealth of highly relevant experience.  In terms of the first unique

position requirement, Pfeltz had spent seven years managing an expanding proportion of the non-

SEA grant program and competition.  That role required her regularly to perform more than ten

of the specific job responsibilities listed in the new job's description.  *See supra* Part I.C.2.

Pfeltz had also spent two years running the fledgling CMO program, requiring her to develop

and apply entirely new criteria for analyzing the effectiveness of program competitions and

grants, and for which she received a "Special Act Award" nomination.  In terms of the third and

fourth unique position requirements, moreover, Pfeltz had been the primary certified COR on the

National Charter Schools Resource Contract—the specific contract over which the new SMPA

would have oversight.  This role had required Pfeltz to "represent [the Department] to

stakeholders and constituencies."  So tight was the nexus between Pfeltz's experience and the

new job's description, in fact, Kilby-Robb herself alleges that the position had been designed

specifically for Pfeltz.  *See infra* Part III.A.2.  "Given that [Pfeltz] was clearly qualified for the

position, Kilby-Robb has a high bar to meet in order to show that she was so much more

qualified that a jury could reasonably conclude that [the Department] selected [Pfeltz] for

discriminatory reasons."  *Kilby-Robb*, 77 F. Supp. 3d at 173.

     In response, Kilby-Robb primarily emphasizes the disparity between the two candidates'

experiences supervising employees.  *See* Dkt. 27 at 36–37.  As Kilby-Robb stresses, Pfeltz

testified that she had "had no supervisory experience," whereas Kilby-Robb spent more than

twenty-five years in the education field in various capacities, including as a principal.  *Id.*  But

Kilby-Robb's longer supervisory track record does not amount to a qualifications gap "great

enough to be inherently indicative of discrimination."  *Jackson*, 496 F.3d at 707.

First, although Kilby-Robb did have many years of supervisory experience, she "accumulated nearly all of [it] . . . outside [the CSP office]." *Pearsall v. Holder*, 610 F. Supp. 2d 87, 101 (D.D.C. 2009).  At the time of the selection, Kilby-Robb had spent scarcely two years at CSP, and the time she had spent there was dedicated to—in Kilby-Robb's own words—"low level" work "generally reserved for career interns and employees below a GS-12 level."  Dkt. 24-3 at 48.  Pfeltz, by contrast, had worked at CSP for seven years, had taken significant responsibility for two of three programs the new SMPA would oversee, and managed the specific contract with which the new SMPA would be charged.  Thus, as in Kilby-Robb's previous nonselection lawsuit, "Kilby-Robb's qualifications" were simply "less closely aligned to the position's requirements than were [the ultimate selectee's]."  *Kilby-Robb*, 77 F. Supp. 3d at 173.

Second, while the interviewing panel recognized that Kilby-Robb "ha[d] more supervisory experience," Dkt. 24-1 at 46 (Huh Aff. ¶ 12), they uniformly found that Pfeltz had a deeper understanding of the relevant policy area and job responsibilities, and gave more thorough and specific answers about what the job entailed, *see id.* (Huh Aff. ¶¶ 12, 14); Dkt. 24-2 at 20 (Aruajo Aff. ¶ 13); *id.* at 31 (Ceja Aff. ¶ 13).  Aruajo's interview notes confirm that impression.  *Compare* Dkt. 24-4 at 13–17 (Kilby-Robb notes), *with id.* at 19–23 (Pfeltz notes).  But, even assuming—as the Court must—that Kilby-Robb was more qualified with respect to *one* of the four unique position requirements, "'it is not for the Court to assess which qualities should weigh more heavily for an employer' in determining which candidate to select for promotion."  *Bell v. Donley*, 928 F. Supp. 2d 174, 180 (D.D.C. 2013) (alterations removed) (quoting *Pendleton v. Holder*, 697 F. Supp. 2d 12, 18 (D.D.C. 2010)); *see also Jackson*, 496 F.3d at 709 ("[W]e will not second-guess how an employer weighs particular factors in the hiring

decision.").  No reasonable jury could find that the choice to weight relevance and depth of substantive experience more heavily than experience supervising employees is so irrational as to raise the specter of discrimination.

The remainder of Kilby-Robb's arguments amount to the claim that Kilby-Robb could have done the SMPA job adequately despite her lack of specific relevant experience within the CSP office.  She writes, for example, that "[i]t is disingenuous for [the Department] to assert that Ms. Kilby-Robb's grant management and contract management experiences were different than Ms. Pfeltz's . . . experiences simply because Ms. Kilby-Robb worked with PIRC grants and contracts and Ms. Pfeltz worked with CSP grants and contracts. . . .  [I]t is clear that both PIRC and CSP grants and contracts utilized the same skill sets."  Dkt. 27 at 30–31; *see also id.* at 32 ("There was no legitimate reason for [the Department] to specifically identify the National Charter Schools Resource Center [c]ontract because there were no unique skill-sets associated with this contract."); *id.* at 37–40 (arguing generally that Kilby-Robb's work in the PIRC office was analogous to Pfeltz's work at CSP).  Indeed, the record reveals Kilby-Robb's general skepticism that the SMPA position required any special skills at all.  Asked at deposition whether Kilby-Robb thought the new position would require "specialized knowledge" of the Charter Schools Program, she responded:

> I'm going to say, "How so?"  Because you read the statute, if you know how to read legislation, you understand the Charter Schools Program.  If you know how to implement the statute, you understand the Charter Schools Program.

Dkt. 24-3 at 42 (Kilby-Robb Dep. 57).

These arguments, however, are "grounded in [Kilby-Robb's] own 'subjective assessments of [her] own credentials,' which are 'largely irrelevant' for purposes of establishing discriminatory motive."  *Bell*, 928 F. Supp. 2d at 180 (second alteration in original) (quoting *Washington v. Chao*, 577 F. Supp. 2d 27, 44 (D.D.C. 2008)).  Instead, the relevant question is

whether the decisionmakers' understanding of the two candidates' qualifications rendered Kilby-Robb "*significantly* better qualified for the job." *Holcomb*, 433 F.3d at 897.  At best, Kilby-Robb's arguments show that a reasonable jury could find that, notwithstanding Pfeltz's substantially more on-point experience, Kilby-Robb could have performed the job just as well.  That may be so.  But "[t]hat is not enough . . . to demonstrate that the [Department's] reliance on comparative qualifications was a pretext for discrimination."  *Jackson*, 496 F.3d at 708.  "This Court will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision."  *Id.* (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C. Cir. 2003)).  And the undisputed evidence shows that Kilby-Robb "'was simply not discernibly better' than the candidate promoted."  *Id.*  The qualifications gap, accordingly, does not support an inference that Kilby-Robb's nonselection was motivated by unlawful discrimination or retaliation.

       2.    *Alleged "Preselection"*

      Kilby-Robb also argues that a reasonable jury could find that Pfeltz had been "preselected" for the SMPA position, in the sense that the new position had been "written specifically for" Pfeltz.  Dkt. 27 at 32; *accord* Dkt. 1 at 4–5 (Compl. ¶¶ 21–24).  In support, she points to the vacancy announcement's statement that the hiree would be responsible for "the National Charter Schools Resource Center contract"—a contract that Pfeltz was already managing.  Dkt. 27 at 32.  She also points to her own testimony that the vacancy announcement "did not use the standard elements" to describe the "Grants Management" and "'COR' duties and responsibilities," *id.* (citing Dkt. 27-2 at 5 (Kilby-Robb Decl. ¶ 11)), and that "it was common knowledge" that Pfeltz "had been identified as the selectee before any announcement was made,"

*id.* at 30 (citing Dkt. 27-2 at 5 (Kilby-Robb Decl. ¶ 14)).  From this, Kilby-Robb says, the jury could infer that the Department's proffered justification is pretextual.  *See* Dkt. 27 at 31–35.

The problem with this argument, however, is that "[p]reselecting a candidate for a position based upon his or her qualifications is not *per se* improper."  *Kilby-Robb*, 77 Fed. Supp. 3d at 169–70 (citing *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008)).  Indeed, "where the selection is to be made from among a narrow band of current employees well known to the selectors, it is hard to see how there could *not* be a substantial degree of pre-selection."  *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 969 (D.C. Cir. 1998) (emphasis added), *vacated on other grounds*, 527 U.S. 526 (1999).  As such, "[f]or preselection to raise an inference of discrimination, evidence must demonstrate that the employer preselected a candidate out of a discriminatory motive or that the employer broadly uses preselection as a method of disguising discrimination and did so in this particular case."  *Kilby-Robb*, 77 Fed. Supp. 3d at 170 (citing *Glass v. Lahood*, 786 F. Supp. 2d 189, 224–25 (D.D.C. 2011), and *Talavera v. Fore*, 648 F. Supp. 2d 118, 135–36 (D.D.C. 2009)).  Thus, the possibility of preselection itself—*i.e.*, the possibility that the vacancy announcement was written with Pfeltz in mind—does not further Kilby-Robb's case absent some additional evidence of discriminatory (or retaliatory) motive.

3.    *Alleged Procedural Deficiencies*

Kilby-Robb also argues that pretext may be inferred from the allegation in her brief that "the Agency violated its own competitive selection procedures."  Dkt. 27 at 32–33.  As far as the Court can tell, this amounts to three arguments.  First, Kilby-Robb argues that the Department failed in its obligation to "fill vacant positions on the basis of merit and fitness" because Pfeltz was initially hired to the Department by Anderson, Pfeltz's aunt's sister, whom she had known "for twenty-four years."  *Id.* at 33.  But it goes without saying that "[f]avoritism based on criteria

22

other than [race, color, age, or other protected characteristics] . . . does not violate the federal anti-discrimination laws and does not raise an inference of discrimination." *Housley v. Boeing Co.*, 177 F. Supp. 2d 1209, 1217 (D. Kan. 2001). And, "[e]ven if a plaintiff 'was victimized by poor selection procedures,' [the Court still] may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Nothing about this alleged and unsubstantiated nepotism furthers Kilby-Robb's case.

Second, Kilby-Robb argues that Pfeltz received "preferential treatment" at the Department. Dkt. 27 at 33. By this, Kilby-Robb apparently means that Pfeltz received frequent promotions, whereas Kilby-Robb did not. She writes in her brief:

> After Ms. Pfeltz was hired [as a Management and Program Analyst], she received a merit promotion or step increase every single year of her employment. She consistently was allowed to jump two grades at a time, and received six grade promotions and two quality step increase[s] in her first seven years at the Agency. Moreover, in 2011, she was promoted to the Supervisory Management and Program Analyst position . . . .

> [Meanwhile,] Ms. Kilby-Robb was repeatedly denied promotions[] in favor of younger Caucasian employees, and despite her extensive credentials and experiences, remains at the same grade and step that she was hired at in 2000. . . .

> Whatever process the Agency followed here did not comply with the Merit plan.

*Id.* at 33–34 (citation omitted). But, again, nothing about this story raises the inference of unlawful discrimination. Kilby-Robb's description of the facts is consistent with—and, indeed, provides further support for—the Department's proffered justification that Pfeltz was simply the more qualified candidate.

Third, Kilby-Robb asserts that "the vacancy announcement did not use the standard elements for 'Grant Management' and 'COR' duties and responsibilities, which are typically used for Supervisory Management and Program Analyst positions." Dkt. 27-2 at 5 (Kilby-Robb

Decl. ¶ 11).  To the extent that this contention is premised on the notion that plaintiffs can, at times, rely on an "employer's failure to follow established procedures or criteria" to establish pretext, *Brady*, 520 F.3d at 495 n.3, she may have a point.  But "[a]n employer's failure to follow its own regulations and procedures, *alone*, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual."  *Fischbach*, 86 F.3d at 1183 (emphasis added) (citation and quotation marks omitted).  Here, Kilby-Robb offers nothing more than her own conclusory assertion that the vacancy announcement "did not use the standard elements," Dkt. 27 at 32, and she offers no evidence suggesting that the announcement was prepared with the discriminatory or retaliatory motive of disfavoring her.  To the contrary, she asserts that one of the "major duties" listed in the announcement *did* favor her, given her greater management experience.  *See* Dkt. 24-3 at 2 (vacancy announcement) (describing "manag[ing] and supervis[ing] staff as a "major duty").  Nor could a reasonable jury find that the other major duties or "unique position requirements" were unmoored from the actual job or crafted to achieve an impermissible result.

None of these purported procedural defects can give rise to an inference of discrimination.

### 4.    *Alleged Conspiracy*

Lastly, Kilby-Robb argues that Pfeltz was "preselected" in a more conspiratorial sense.  According to Kilby-Robb's brief, Pfeltz's "preselection" to the 2011 SMPA position "was orchestrated by senior officials at the [a]gency."  Dkt. 27 at 29.  The preselection began eight years earlier in 2003, she says, when Anderson started "t[elling] each of [Kilby-Robb's] supervisors that she would never permit her to be promoted and that she hated [her]."  *Id.* (citing Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 8).  "Then, in 2009," Kilby-Robb writes, "[her] supervisors

[in the PIRC office] decided they wanted to promote a younger, Caucasian employee to the supervisory position." *Id.* (citing Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 10)).  To that end, Kilby-Robb says, they "transferred her to the [CSP] program and then refused to assign her any CSP grants or [allow her to] perform substantive CSP duties in an attempt to bar her from any future promotions." *Id.* at 29–30 (citing Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶ 10)).  As part of this effort to deny Kilby-Robb promotion opportunities, Kilby-Robb says, Anderson and other managers "posted a vacancy announcement . . . [using] selective screening factors" intentionally designed "to eliminate all others except the young, Caucasian female they wanted to promote [*i.e.*, Pfeltz]." *Id.* at 30.  Anderson and the other managers then "instructed" Huh, who "had been in his position for only three months," on how to write the vacancy announcement and select that candidate. *Id.* (citing Dkt. 27-2 at 5–6 (Kilby-Robb ¶ 15).  In short, Kilby-Robb's theory appears to be that Anderson and others intentionally deprived Kilby-Robb of the substantive skills she would need to be competitive for the SMPA position, such that "it is impossible to make a credible comparison of the applicants," and the Department should be liable for discrimination on the grounds that a campaign "orchestrated by senior officials" was designed to prevent Kilby-Robb from becoming qualified for the job for which she was passed over.[5] *Id.* at 29, 35.

　　This theory suffers from several fatal defects.  *First*, it contradicts Kilby-Robb's earlier contention that she was not only qualified, but was so much better qualified than Pfeltz that the gap could give rise to an inference of discriminatory bias.  *See supra* Part III.A.1.  *Second*, the theory depends on the unsupported claim of conspiracy, derived only from Kilby-Robb's speculation regarding the intentions of third parties of which she has no personal knowledge.

---

[5]  To the extent that Kilby-Robb means merely to argue for a "cat's paw" theory of discrimination, that effort must also fail, as the Court explains below.  *See infra* Part III.B.2.

*See* Fed. R. Civ. P. 56(c)(4) (requiring that declaration used to oppose motions for summary judgment "be made on personal knowledge").  Beyond Kilby-Robb's unsupported declaration, there is no evidence in the record to suggest that Anderson or anyone else had any influence over the SMPA selection panel.  To the contrary, *all* of the evidence offered on personal knowledge supports the conclusion that Anderson played no role in Pfeltz's selection.  *See* Dkt. 24-1 at 47 (Huh Aff. ¶¶ 17–19); Dkt. 24-2 at 3 (Anderson Aff. ¶¶ 9–14); *id.* at 11 (Knight Aff. ¶¶ 9–13); *id.* at 20 (Araujo Aff. ¶¶ 14–15); *id.* at 31 (Ceja Aff. ¶¶ 14–15).  *Third*, this theory, even if credited, does nothing to establish that the "senior officials" who "orchestrated" Kilby-Robb's nonselection did so because of her race, age, or color.

In sum, Kilby-Robb has not even alleged—let alone adduced evidence to show—that all three panelists conspired with Anderson or anyone else to deny Kilby-Robb a promotion because of her age, race, or color.  Her unsubstantiated allegations are insufficient to allow a reasonable jury to disbelieve the Department's stated rationale for Kilby-Robb's nonselection—namely, that Pfeltz was a better fit for the position.

**B.    Retaliation Under Title VII and the ADEA**

Kilby-Robb also alleges that Huh selected Pfeltz over her for the 2011 SMPA position in retaliation for Kilby-Robb's substantial prior EEO activity. Dkt. 1 at 1 (Compl. ¶ 1).  This claim requires proof that retaliatory motives were the "but for" cause of Kilby-Robb's nonselection. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  As evidence, Kilby-Robb points to (1) her "multiple ongoing acts of protected activity" (although the only "protected activities" she identifies are her five prior EEO complaints, the last of which occurred in August 2010); and (2) what her brief describes as the "continued harassment" to which she had been subjected, "including statements by . . . Anderson that she hates [Kilby-Robb] and will never

permit her to be promoted[,] and statements by her supervisors and other management officials

that she should have been fired for filing an[] EEO complaint or that she knows what is

happening to her is in relation to her EEO complaint."  Dkt. 27 at 42; *see also supra* Part I.A

(listing Kilby-Robb's allegations regarding her "continued harassment").  None of this evidence

would permit a reasonable jury to find that the Department's proffered justification is false and

that retaliatory motives were the but for cause of Kilby-Robb's nonselection.

       1.   *EEO Complaints*

      Kilby-Robb's argument seems to be that her EEO complaints were sufficiently

temporally proximate to the nonselection to give rise to an inference of retaliation.  *See* Dkt. 27

at 40–42.  This argument is twice flawed.  *First*, Kilby-Robb has adduced no evidence that two

of the three decisionmakers—Araujo and Ceja—were even aware of Kilby-Robb's prior EEO

complaints at the time of her nonselection.  *See* Dkt. 27 at 40–42.  To the contrary, both have

attested that they were not.  *See* Dkt. 24-2 at 19 (Araujo Aff. ¶ 8); *id.* at 30 (Ceja Aff. ¶ 8); *cf.*

Dkt. 24-1 at 45 (Huh Aff. ¶ 7) (averring that, as of March 2012, Kilby-Robb had informed Huh

about her prior EEO activity).  *Second*, "[o]nce an employer has put forth legitimate, non-

retaliatory reasons for a challenged action"—as the Department has done here—"positive

evidence *beyond mere proximity* is required to defeat the presumption that the proffered

explanations are genuine."  *Allen*, 795 F.3d at 47 (emphasis added) (citations and internal

quotation marks omitted).  Here, it appears that Kilby-Robb was involved, at one level or

another, in protected EEO activity for most—if not all—of the time from 2002 to the present.

*See* Dkt. 27-2 at 25; *supra* Part I.A (listing court cases).  Although Title VII and the ADEA

protect her from adverse employment action taken because of that activity, they do not give her

an automatic right to go to a jury on *any* claim of retaliation over the past fifteen years—at least not without more.

Kilby-Robb suggests that the D.C. Circuit's decision in *Singletary v. District of Columbia*, 351 F.3d 519 (D.C. Cir. 2003), provides just such a right.  *See* Dkt. 27 at 40–42.  Her reliance on that case, however, is misplaced.  *Singletary* concerned only the showing necessary to make out a *prima facie* case of retaliation, and held that the district court erred by failing to consider certain categories of protected activity—namely, two letters the plaintiff's counsel had sent regarding the status of the case, and the plaintiff's "attempt to litigate his claim by filing an appeal to the D.C. Court of Appeals."  351 F.3d at 524–25.  Here, by contrast, the analysis of any *prima facie* case has already "fall[en] away," *Allen*, 795 F.3d at 39, so evidence *beyond* mere proximity is necessary, *id.* at 47.

2.    *Alleged "Continued Harassment"*

Kilby-Robb's description of her "continued harassment" does not fill this evidentiary gap.   Omitting the portions of Kilby-Robb's declaration and interrogatory responses that describe events not within her personal knowledge, and omitting those portions that are not probative of retaliatory animus, the Court is left with three pieces of evidence:

(1)   The statements of Kilby-Robb's various supervisors between 2003 and 2008 that Anderson said she "hates" Kilby-Robb and that she "would never promote her."

(2)   The 2004 statement of Kilby-Robb's then-second-line supervisor, Nina Rees, that Kilby-Robb "should have been 'fired' for filing an EEO complaint."  (This statement was litigated to trial in one of Kilby-Robb's prior lawsuits.  *See supra* note 1.)

(3)   The undated statement of Kilby-Robb's then-first-line supervisor, John Fiegel, that he had previously planned to submit a request for payment on [her] behalf for [her] service

28

as an 'acting team leader,'" but that "he was no longer going to submit this request

because [she] had filed an EEO case." Although Kilby-Robb does not provide the precise

date for this statement, it appears that Fiegel served as her direct supervisor at most

between 2002 and 2007.[6]

Dkt. 27-2 at 4 (Kilby-Robb Decl. ¶¶ 8, 9).

Because none of this evidence concerns the actual nonselection decisionmakers, Kilby-

Robb seems to be hinting at a "cat's paw" theory of retaliation (although she provides no such

argument in her brief, and cites none of the relevant cases).  Under the "cat's paw" theory, "an

employer can be liable when a direct supervisor harbors discriminatory [or retaliatory] animus

and influences the ultimate decision maker, even if that decision maker lacks any discriminatory

[or retaliatory] animus." *Noisette v. Lew*, --- F. Supp. 3d ---, 2016 WL 5674786, at *16 (D.D.C.

Sept. 30, 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)).  "To prevail on a

'cat's paw' theory, the plaintiff must show that '(1) [the direct] supervisor perform[ed] an act

motivated by discriminatory animus (2) that [was] *intended* by the [direct] supervisor to cause an

adverse employment action, and . . . (3) that act [was] a proximate cause of the ultimate

employment action.'"  *Id.* (alterations in original) (quoting *Morris*, 825 F.3d at 668).

Applying this standard, Kilby-Robb's "cat's paw" theory must fail.  Kilby-Robb has

identified no discriminatory or retaliatory act by Anderson, Rees, or Figel that has any causal

link to her 2011 nonselection.  The *only* evidence in the record, moreover, falls on the other side

of the ledger:  Huh, Araujo, and Ceja all attested that neither Anderson, Knight, nor any other

official played any role in the 2011 SMPA selection, nor influenced their decision in any way.

---

[6]  The Court assumes for present purposes that these statements could be presented in a form admissible at trial.

*See* Dkt. 24-1 at 47 (Huh Aff. ¶¶ 17–19); Dkt. 24-2 at 20 (Araujo Aff. ¶¶ 14–15); *id.* at 31 (Ceja Aff. ¶¶ 14–15).  Anderson and Knight also attested that they were not involved.  Dkt. 24-2 at 3 (Anderson Aff. ¶¶ 9–14); *id.* at 11 (Knight Aff. ¶¶ 9–14).  Other breaks in the causal chain, moreover, include the fact that the earlier statements all came from Kilby-Robb's supervisors in the PIRC program (not the CSP), and the fact that they predate the nonselection by at least three years, and in some cases, closer to eight.  No reasonable jury could find that a "cat's paw" theory applies here.

## CONCLUSION

The Court will, accordingly, **GRANT** the Department's motion for summary judgment (Dkt. 24).

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 30, 2017